IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PAIGE MARTINEAU; and
SUSQUEHANNA LEGAL AID FOR ADULTS AND YOUTH, INC.
(SLAAY),
Plaintiffs,
v.
AMERICAN BAR ASSOCIATION; PENNSYLVANIA BAR
ASSOCIATION; PENNSYLVANIA LEGAL AID NETWORK,
INC. (PLAN); LEGAL SERVICES CORPORATION;
NATIONAL CONFERENCE OF BAR EXAMINERS;
NORTH PENN LEGAL SERVICES (NPLS);UNION–SNYDER
COUNTY BAR ASSOCIATION (USCBA); BLOOMSBURG FAIR
ASSOCIATION; PENNSYLVANIA BOARD OF LAW
EXAMINERS;SUPREME COURT OF PENNSYLVANIA; CIVIL
PROCEDURAL RULES COMMITTEE; CRIMINAL
PROCEDURAL RULES COMMITTEE; ADMINISTRATIVE
OFFICE OF PENNSYLVANIA COURTS (AOPC);
PENNSYLVANIA DISCIPLINARY BOARD;
OFFICE OF DISCIPLINARY COUNSEL; JUDICIAL CONDUCT
BOARD OF PENNSYLVANIA;COURT OF JUDICIAL
DISCIPLINE; PENNSYLVANIA DEPARTMENT OF MILITARY
AND VETERANS AFFAIRS (DMVA);PENNSYLVANIA
GENERAL ASSEMBLY; COMMONWEALTH OF
PENNSYLVANIA;OFFICE OF ATTORNEY GENERAL
(PENNSYLVANIA); UNITED STATES CONGRESS; UNITED
STATES JUDICIAL CONFERENCE / COMMITTEE ON RULES
OF PRACTICE AND PROCEDURE; NORTHUMBERLAND
COUNTY PROTHONOTARY'S OFFICE; HONORABLE
MICHAEL PIECUCH, President Judge, 17th Judicial District;
HONORABLE LORI HACKENBERG, Judge, 17th Judicial District;
HONORABLE MARK J. CONWAY, United States Bankruptcy
Judge, Middle District of Pennsylvania; REPRESENTATIVE
ROBERT LEADBETER, Pennsylvania House of Representatives;
HEATH BROSIUS, District Attorney of Snyder County; JAMIE
SALESKI, Prothonotary of Northumberland County; K. MICHAEL
SULLIVAN, ESQUIRE; SARAH STIGERWALT-EGAN,
ESQUIRE; and JOHN and JANE DOES 1–50,
Defendants.

CASE NO.

COMPLAINT

JURY DEMANDED

## I. INTRODUCTION

1.      This action arises from a coordinated series of retaliatory acts carried out by a network of interconnected individuals and institutions whose authority over Plaintiffs was made possible only because the Commonwealth of Pennsylvania and the United States have delegated core governmental powers to private entities without constitutional safeguards. Hostility toward Plaintiffs began inside North Penn Legal Services (NPLS), where protected whistleblowing regarding client mistreatment triggered escalating retaliation. This hostility was carried into the Union–Snyder County Bar Association (USCBA) through an NPLS-affiliated volunteer and then acted upon by USCBA leadership, including Sarah Stigerwalt-Egan and K. Michael Sullivan, who used bar-association authority to block Plaintiffs' public-service participation, to suspend Wills for Heroes unless Plaintiffs forfeited their right to sue, and to disseminate false information to state agencies. District Attorney Heath Brosius, a USCBA member and STOP Coalition participant, altered his treatment of Plaintiffs after receiving their protected speech and supported exclusionary actions within the bar. Judges Michael Piecuch, Lori Hackenberg, and Mark Conway reinforced these retaliatory acts by issuing adverse decisions, pressuring Plaintiffs to abandon claims, selectively enforcing rules, and treating Plaintiffs differently from every similarly situated participant in the judicial system. Northumberland County Prothonotary Jamie Saleski selectively enforced filing and recording processes against Plaintiffs to advance the same institutional hostility.

2.      The retaliation spread into the Pennsylvania Bar Association (PBA) when its Wills for Heroes director, David Trevaskis, reversed earlier commitments to Plaintiffs after communication with NPLS leadership and USCBA actors, and PBA then coordinated with the Pennsylvania Department of Military and Veterans Affairs (DMVA) to cancel a scheduled Wills for Heroes event on the pretext of Plaintiffs' protected speech. Representative Robert Leadbeter and the Bloomsburg Fair Association (BFA) subsequently adopted and acted upon the same retaliatory misinformation generated within this network. Each of these defendants acted not in isolation but within a consistent flow of influence, communication, authority, and shared norms, moving from NPLS to PLAN and

LSC to USCBA and PBA, from local bar governance into judicial treatment, from judicial treatment

into administrative enforcement, and from bar-level exclusion into DMVA and community-level

retaliation.

3.       These individual retaliatory acts were possible only because the regulatory structure

governing the practice of law and the administration of public legal services in Pennsylvania is built

upon fifteen unconstitutional structural delegations of state authority. The American Bar

Association (ABA) controls accreditation standards that PaSC and the Pennsylvania Board of Law

Examiners (PBLE) adopt as binding prerequisites to licensure. The National Conference of Bar

Examiners (NCBE) controls examination content that PaSC enforces. The Civil and Criminal

Procedural Rules Committees of the Supreme Court of Pennsylvania adopt rules influenced by

private standards. The Administrative Office of Pennsylvania Courts (AOPC), the Pennsylvania

Disciplinary Board (DB), the Office of Disciplinary Counsel (ODC), the Judicial Conduct Board

(JCB), and the Court of Judicial Discipline (CJD) enforce disciplinary and judicial-conduct regimes

derived from privately drafted ethics rules. PLAN and LSC control the funding and oversight of

NPLS, which acts as a gatekeeper to publicly funded legal services. The Office of Attorney General

(OAG), the Pennsylvania General Assembly (PGA), the Commonwealth of Pennsylvania (COPA),

the United States Congress (USC), and the United States Judicial Conference (USJC) enable or

ratify these delegations by statute or by rule without providing constitutional guardrails. DMVA and

BFA rely upon the same ecosystem when administering public-facing programs.

4.       Because each institutional defendant exercises authority that originates not from

constitutionally accountable sources but from these private and hybrid delegations, each defendant's

actions reinforce the others. The intertwining of privately created standards, publicly enforced

processes, bar-association discretion, legal-aid governance, judicial authority, disciplinary

enforcement, and community-program administration produces a single, unified regulatory

environment in which retaliation can spread horizontally across institutions and vertically through

levels of government. Plaintiffs' injuries were not merely the product of individual misconduct but were facilitated and magnified by the unconstitutional structure that allowed private and hybrid entities to wield sovereign power without transparency, oversight, or constitutional restraint.

5.

**6.     II. JURISDICTION AND VENUE**

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs bring claims arising under the Constitution and laws of the United States, including the First Amendment, the Fourteenth Amendment, the Supremacy Clause, the non-delegation doctrine, and 42 U.S.C. § 1983.

8.     This Court has jurisdiction under 28 U.S.C. § 1343(a)(3) and (a)(4) because Plaintiffs seek to redress the deprivation, under color of state law and federal law, of rights secured by the Constitution and federal statutes, and seek equitable and declaratory relief authorized by those provisions.

9.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over any state-law claims or state-constitutional claims arising from the same case or controversy as Plaintiffs' federal claims.

10.    Declaratory relief is authorized under 28 U.S.C. §§ 2201 and 2202 because an actual controversy exists between Plaintiffs and Defendants regarding the constitutionality of the delegations of governmental authority, the enforcement of attorney-regulatory structures, and the operation of public legal-services systems challenged herein.

11.    This Court has authority to issue injunctive and declaratory relief against state officers, state entities, and federal entities acting under color of law pursuant to Ex parte Young, 209 U.S. 123 (1908), 5 U.S.C. § 702, and the equitable powers of the federal courts.

12.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because many Defendants reside or maintain official offices within the Middle District of Pennsylvania, including judicial officers, county officials, and state agencies whose actions gave rise to Plaintiffs' injuries.

13.     Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred within the Middle District of Pennsylvania, including the acts of retaliation, regulatory enforcement, exclusion from public programs, administrative conduct, and implementation of the challenged rules and delegations.

14.     Venue is further proper under 28 U.S.C. § 1391(b)(3) because multiple Defendants reside outside the Commonwealth of Pennsylvania or in multiple districts, and the Middle District of Pennsylvania is the district where Plaintiff resides and where significant operative events occurred.

**15.     III. PARTIES**

16.     Plaintiff Paige Martineau is an adult individual who brings this action pursuant to the United States Constitution and 42 U.S.C. § 1983 for violations of her constitutional rights.

17.     Plaintiff Susquehanna Legal Aid for Adults and Youth, Inc. ("SLAAY") is a Pennsylvania nonprofit corporation with its principal place of business located in Union County, Pennsylvania. SLAAY brings this action on its own behalf and in furtherance of its public-interest mission.

18.     Plaintiffs allege that each Defendant acted under color of state law, federal law, or delegated governmental authority, including power conferred by statute, court rule, administrative delegation, judicial order, or governmental entanglement. Each Defendant exercised authority over Plaintiffs or the public that exists solely by virtue of governmental delegation, authorization, or state action.

19.     Defendant American Bar Association ("ABA") is a private nonprofit corporation with its principal offices located at 321 North Clark Street, Chicago, Illinois 60654.

20.     Defendant Pennsylvania Bar Association ("PBA") is a statewide voluntary bar association with offices located at 100 South Street, Harrisburg, Pennsylvania 17108.

21.     Defendant Pennsylvania Legal Aid Network, Inc. ("PLAN") is a Pennsylvania nonprofit corporation with offices located at 118 Locust Street, Harrisburg, Pennsylvania 17101.

22.     Defendant Legal Services Corporation ("LSC") is a federally established nonprofit corporation with principal offices at 3333 K Street NW, Washington, District of Columbia 20007.

23.     Defendant National Conference of Bar Examiners ("NCBE") is a nonprofit corporation with offices at 302 South Bedford Street, Madison, Wisconsin 53703.

24.     Defendant North Penn Legal Services ("NPLS") is a Pennsylvania nonprofit corporation that provides civil legal services in multiple counties, with administrative offices including 100 South Main Street, Wilkes-Barre, Pennsylvania 18701, and additional regional offices in the Commonwealth.

25.     Defendant Union–Snyder County Bar Association ("USCBA") is a Pennsylvania nonprofit corporation that may be served at PO Box 328, Middleburg, Pennsylvania 17842.

26.     Defendant Bloomsburg Fair Association is a Pennsylvania nonprofit corporation with offices located at 620 West Third Street, Bloomsburg, Pennsylvania 17815.

27.     Defendant Pennsylvania Board of Law Examiners ("PBLE") is an agency of the Supreme Court of Pennsylvania with offices at 601 Commonwealth Avenue, Suite 3600, Harrisburg, Pennsylvania 17120.

28.     Defendant Supreme Court of Pennsylvania is the highest court of the Commonwealth and maintains offices at the Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120.

29.     Defendant Civil Procedural Rules Committee is a rulemaking body of the Supreme Court of Pennsylvania, with its mailing address at the Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120.

30.     Defendant Criminal Procedural Rules Committee is a rulemaking body of the Supreme Court of Pennsylvania, with its mailing address at the Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120.

31.     Defendant Administrative Office of Pennsylvania Courts ("AOPC") is an administrative arm of the Pennsylvania Judiciary located at 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120.

32.     Defendant Pennsylvania Disciplinary Board is an agency of the Supreme Court of

Pennsylvania located at 601 Commonwealth Avenue, Suite 5600, Harrisburg, Pennsylvania 17120.

33.     Defendant Office of Disciplinary Counsel ("ODC") is responsible for enforcement of the

Rules of Professional Conduct and maintains offices at 601 Commonwealth Avenue, Harrisburg,

Pennsylvania 17106.

34.     Defendant Judicial Conduct Board of Pennsylvania is an independent state agency located at

P.O. Box 62525, Harrisburg, Pennsylvania 17106.

35.     Defendant Court of Judicial Discipline is a constitutional tribunal of Pennsylvania located at

the Pennsylvania Judicial Center, 601 Commonwealth Avenue, Harrisburg, Pennsylvania 17120.

36.     Defendant Pennsylvania Department of Military and Veterans Affairs ("DMVA") is a state

agency with offices at Bldg. 0-47, Fort Indiantown Gap, Annville, Pennsylvania 17003.

37.     Defendant Pennsylvania General Assembly is the legislative body of the Commonwealth and

may be served at the Main Capitol Building, Harrisburg, Pennsylvania 17120.

38.     Defendant Commonwealth of Pennsylvania may be served through the Office of Attorney

General at Strawberry Square, Harrisburg, Pennsylvania 17120.

39.     Defendant Office of Attorney General (Pennsylvania) is a state executive office located at

Strawberry Square, Harrisburg, Pennsylvania 17120.

40.     Defendant United States Congress is the legislative body of the United States and may be

served at the United States Capitol, Washington, District of Columbia 20510.

41.     Defendant United States Judicial Conference / Committee on Rules of Practice and

Procedure is the national rulemaking body for the federal courts, located at the Thurgood Marshall

Federal Judiciary Building, One Columbus Circle NE, Washington, District of Columbia 20002.

42.     Defendant Northumberland County Prothonotary's Office is a county government office

located at 201 Market Street, Sunbury, Pennsylvania 17801.

43.    Defendant Honorable Michael Piecuch is the President Judge of the 17th Judicial District (Union and Snyder Counties), with chambers at the Snyder County Courthouse, 9 West Market Street, Middleburg, Pennsylvania 17842, and is sued in his individual and official capacities.

44.    Defendant Honorable Lori Hackenberg is a Judge of the Court of Common Pleas of the 17th Judicial District, with chambers at the Union County Courthouse, 103 South Second Street, Lewisburg, Pennsylvania 17837, and is sued in her individual and official capacities.

45.    Defendant Honorable Mark J. Conway is a United States Bankruptcy Judge for the Middle District of Pennsylvania, with chambers at the Max Rosenn U.S. Courthouse, 197 South Main Street, Wilkes-Barre, Pennsylvania 18701, and is sued in his individual and official capacities.

46.    Defendant Representative Robert Leadbeter is a member of the Pennsylvania House of Representatives for the 109th Legislative District, whose official address is the Main Capitol Building, Harrisburg, Pennsylvania 17120.

47.    Defendant Heath Brosius is the District Attorney of Snyder County, with offices at the Snyder County Courthouse, 9 West Market Street, Middleburg, Pennsylvania 17842.

48.    Defendant Jamie Saleski is the Northumberland County Prothonotary, located at 201 Market Street, Sunbury, Pennsylvania 17801.

49.    Defendant K. Michael Sullivan, Esquire, is a Pennsylvania-licensed attorney who may be served via his attorney-registration address at 601 Commonwealth Avenue, Suite 5600, Harrisburg, Pennsylvania 17120, or at his business address as permitted by law.

50.    Defendant Sarah Stigerwalt-Egan is a Pennsylvania attorney and President of the Union–Snyder County Bar Association and may be served at PO Box 328, Middleburg, Pennsylvania 17842, or at her professional office address as permitted by law.

51.    John and Jane Does 1–50 are persons or entities whose identities are presently unknown who participated in, assisted with, or benefitted from the unconstitutional policies, practices, delegations, and acts alleged in this Complaint.

**IV. CAUSES OF ACTION**

**Count 1. FIRST AMENDMENT RETALIATION (42 U.S.C. § 1983)**

**(NPLS, USCBA, Stigerwalt-Egan, Sullivan, Brosius, Piecuch, Hackenberg, Conway, Saleski, PBA, DMVA, Bloomsburg Fair, and Leadbeter)**

52.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

53.    Plaintiff Martineau engaged in protected First Amendment activity beginning in 2018 when she reported serious misconduct and client harm occurring at North Penn Legal Services, including the wrongful loss of homes, children, property, and legal rights for vulnerable clients.

54.    These disclosures addressed matters of public concern involving public funding, public servants, and systemic failure in an essential safety-net system.

55.    NPLS, instead of addressing the misconduct, responded with hostility, marginalization, reprimands, and retaliatory treatment designed to deter Martineau from continuing to speak.

56.    The retaliatory culture was reinforced by Mary Beth Clark, a key NPLS-connected volunteer who shaped internal and external attitudes and who later carried this hostility into the Union–Snyder County Bar Association, where she was vice-president when Martineau resigned and president soon thereafter.

57.    After Martineau's constructive resignation in 2021, NPLS continued retaliating by prohibiting staff from speaking to her, excluding her from Judicare, blocking volunteer opportunities, undermining SLAAY's ability to operate, and treating her more harshly than any other former employee who left in good standing.

58.    These post-resignation acts fall well within the limitations period and demonstrate continuous retaliation stemming from her original whistleblowing.

59.    NPLS's hostility spread into USCBA because Clark concurrently held leadership positions within USCBA and used that authority to direct USCBA decisions against Plaintiffs.

60.    In violation of her written representations that Martineau would be kept informed of Wills for Heroes scheduling and that SLAAY would be included, Clark excluded Martineau from communications and barred SLAAY from participating, causing wasted time, lost resources, and direct harm to disabled veterans and wounded warriors who received inconsistent and inaccurate eligibility information.

61.    When Martineau attempted repeatedly to correct the misinformation, protect disabled veterans, and put the issue on USCBA's agenda, USCBA leadership refused to engage.

62.    Martineau then sent bar-wide listserv emails discussing the mistreatment of veterans and the improper exclusion of SLAAY.

63.    These emails were core First Amendment speech on matters of public concern.

64.    On May 29, 2025, after Martineau warned Sullivan that his conduct violated constitutional rights and that she might sue him personally, Sullivan retaliated by using an official Wills for Heroes Committee meeting to move for the total suspension of all Wills for Heroes services in Union–Snyder County unless Martineau promised not to sue him personally or immediately withdrew her legal claims.

65.    This constituted prior restraint, an unconstitutional condition, and viewpoint-based retaliation through a public program.

66.    Because SLAAY was already successfully hosting Wills for Heroes events for the Pennsylvania DMVA in Clinton County, and because no bar association affiliation is legally required to host such events, Martineau informed PBA and DMVA that SLAAY was ready to step in as host for Union–Snyder County to ensure that disabled veterans would continue receiving services.

67.    This communication was protected First Amendment petitioning.

68.     In response, USCBA President Sarah Stigerwalt-Egan sent false, disparaging, and hostile emails to PBA and DMVA intended to undermine SLAAY and prevent it from serving disabled veterans.

69.     These communications were retaliatory and designed to sabotage Plaintiffs' protected civic and legal advocacy.

70.     At the July 2025 USCBA meeting held at Brendan's Towne Tavern in Lewisburg, Stigerwalt-Egan confronted Martineau in front of others, raised her voice, and berated her for sending protected emails and for threatening nonfrivolous litigation.

71.     When Martineau proposed a simple resolution that USCBA would not retaliate against constitutionally protected criticism or litigation threats, which merely codifies existing First Amendment law, Stigerwalt-Egan refused to support it, demonstrating explicit retaliatory intent.

72.     Shortly after Plaintiffs filed this lawsuit, USCBA cancelled its next scheduled meeting, further evidencing retaliatory motive and an effort to exclude Plaintiffs from bar governance and public-interest legal work.

73.     The Pennsylvania Bar Association and the Pennsylvania Department of Military and Veterans Affairs jointly provided written notice cancelling the October 11, 2025 Wills for Heroes event in Union–Snyder County, explicitly stating that the cancellation was due to SLAAY's planned peaceful protest.

74.     Cancelling a public program because of an anticipated peaceful protest is unlawful retaliation, a prior restraint, and impermissible viewpoint discrimination.

75.     Upon information and belief, the real reason was that PBA and DMVA could not secure sufficient volunteers without SLAAY and sought to cover up the earlier retaliatory exclusion.

76.     District Attorney Brosius retaliated after receiving Martineau's April and May 2025 protected-speech emails by obstructing SLAAY's participation in STOP Coalition activities,

undertaking investigations into her that he would not undertake against similarly situated attorneys, and by supporting USCBA policies designed to harm Plaintiffs.

77.    President Judge Piecuch retaliated by treating Martineau adversely after receiving her protected emails, issuing rulings and administrative decisions intended to disadvantage her and her clients, including violating a bankruptcy stay in one of Martineau's cases after she spoke out.

78.    Judge Conway retaliated after Martineau attempted to report Piecuch's misconduct, pressuring her to settle, asserting unfounded ethical accusations, and using judicial authority to silence her reporting of a serious civil-rights violation.

79.    Judge Hackenberg retaliated by supporting USCBA's anti-fee efforts and by altering her treatment of Plaintiffs after receiving their protected speech.

80.    Prothonotary Jamie Saleski retaliated by enforcing recording rules selectively against Plaintiffs, and her retaliation was supported by the involvement of USCBA Treasurer and judicial law clerk Kathleen Lincoln, who made threatening statements at the July 26, 2025 USCBA meeting regarding her involvement with the Saleski state court case.

81.    The Bloomsburg Fair Association and Representative Leadbeter engaged in further adverse actions against Plaintiffs after the Wills for Heroes retaliation was announced at a PA DMVA meeting in August of 2025, acting in concert with the same interconnected network of NPLS affiliates, USCBA leadership, judicial officers, PBA officials, and DMVA personnel, by excluding them from an event they had previously invited them to.

82.    Each of these defendants took related, adverse actions because of Plaintiffs' protected First Amendment speech, which included whistleblowing, reporting judicial misconduct, correcting public misinformation, advocating for disabled veterans, challenging monopolistic legal-aid practices, seeking nonprofit funding, criticizing misuse of public resources, and petitioning government entities.

83.     Defendants' conduct would deter a person of ordinary firmness from continuing to engage in protected First Amendment activity, and did in fact chill Plaintiffs' speech, disrupt their nonprofit operations, and cause significant personal, professional, and financial harm.

84.     These defendants acted under color of state law because they exercised authority conferred by statute, judicial delegation, public-service programs, bar-association governance, or joint action with state actors.

85.     Defendants' coordinated and individual conduct violated clearly established First Amendment rights.

86.     Plaintiffs request declaratory and injunctive relief, compensatory and punitive damages where permitted, costs, fees, and all other appropriate remedies.

## Count 2. FRAUD / FRAUDULENT MISREPRESENTATION

**(Against NPLS, USCBA, Stigerwalt-Egan, Sullivan, PBA, Trevaskis, DMVA, Bloomsburg Fair Association, and Leadbeter)**

87.     Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

88.     Multiple defendants, acting individually and in coordination, made intentional, material, and knowingly false representations to Plaintiffs, to other governmental and quasi-governmental organizations, to the public, and to vulnerable populations including disabled veterans and domestic-violence survivors. These false statements were made for the purpose of inducing reliance, obstructing Plaintiffs' work, preserving monopolistic control, and advancing institutional retaliation against protected speech.

89.     Clark, acting as a key NPLS-connected volunteer and influencer, intentionally misrepresented to Plaintiffs—in writing—that Martineau and SLAAY would be kept informed and included in Wills for Heroes planning, communications, and decision-making.

90.    Clark knew these statements were false at the time she made them because she simultaneously acted to exclude Plaintiffs from all Wills for Heroes communications, obstructed their ability to participate, and concealed scheduling and eligibility information from Plaintiffs.

91.    Clark's misrepresentations caused Plaintiffs to expend time, labor, and resources preparing for Wills for Heroes participation, only to be blindsided by exclusion, and caused disabled veterans and wounded warriors to receive inconsistent and inaccurate information about eligibility and services.

92.    USCBA leadership, including Stigerwalt-Egan and Sullivan, knowingly misrepresented to Plaintiffs and others that SLAAY would be included in Wills for Heroes planning.

93.    Stigerwalt-Egan further made false and defamatory statements to the Pennsylvania Bar Association and the Pennsylvania Department of Military and Veterans Affairs regarding SLAAY's intentions, professionalism, qualifications, and conduct, intending to damage SLAAY's reputation and block its participation in Wills for Heroes and other public-interest programs.

94.    On the same day, Stigerwalt-Egan emailed the PA DMVA that veterans had "always been invited" to the Wills for Heroes event in Lewisburg, Pennsylvania, and emailed Martineau that it would have been "impossible" to invite veterans from the beginning.

95.    Stigerwalt-Egan did not realize the PA DMVA would forward her email to Martineau, and that Martineau would document her false statements.

96.    These statements were knowingly false and designed to influence PBA and DMVA to exclude Plaintiffs from public programs, undermine Plaintiffs' funding proposals, and deprive Plaintiffs of economic opportunities.

97.    Sullivan knowingly misrepresented that Wills for Heroes would be suspended because of alleged misconduct by Plaintiffs, when in fact he moved to suspend the program solely to coerce Plaintiffs into abandoning litigation and surrendering their constitutional rights.

98.    This constitutes extortionate fraud and was made with full knowledge of its falsity.

99.    Sullivan also send an objectively false and disparaging email about Martineau to the bar listserv on April 24, 2025, after Martineau protested the exclusion of disabled veterans and wounded warriors from Wills for Heroes events.

100.    PBA's Wills for Heroes director David Trevaskis falsely represented to Plaintiffs that he would support SLAAY, help secure funding, and coordinate collaboration, while knowing he intended to retract such support after consulting with NPLS leadership.

101.    Trevaskis knowingly misrepresented Plaintiffs' role, intentions, and conduct in communications to DMVA and others, contributing to the retaliatory exclusion of SLAAY from public programming.

102.    The PBA falsely represents that any attorney in good standing can access its benefits, when it actually commits First Amendment retaliation and excludes attorneys who exercise First Amendment rights.

103.    PA DMVA and PBA jointly issued written statements falsely claiming the October 11, 2025 Wills for Heroes event was canceled because SLAAY planned a protest, when in fact a peaceful protest is protected speech and cannot lawfully serve as a basis for cancellation and PBA and DMVA could not staff the event without SLAAY volunteers.

104.    These false statements were knowingly made to conceal retaliatory motives, mislead the public, and damage Plaintiffs' reputation, harming disabled veterans by depriving them of promised free legal services.

105.    The PA DMVA promised SLAAY it could host Wills for Heroes in Clinton County and that they would support SLAAY's programs at a level equal to the support they provide PBA's Wills for Heroes Programs, which were false.

106.    The Bloomsburg Fair Association and Representative Leadbeter made false statements about Plaintiffs' intentions, conduct, and eligibility to participate in public and community events after

WFH retaliation occurred, knowing such statements were untrue and intended to justify further exclusion and retaliation.

107.    Plaintiffs reasonably relied on the false representations of these defendants, including preparing for Wills for Heroes participation, investing resources into STOP Coalition collaboration, pursuing funding proposals based on misrepresented eligibility participating in USCBA activities under false pretenses, and responding to misleading communications from PBA, DMVA, and others.

108.    Plaintiffs' reliance resulted in significant harm, including wasted resources, reputational injury, exclusion from public programs, lost funding opportunities, lost volunteer opportunities, harm to Plaintiffs' professional standing, and denial of services to disabled veterans and vulnerable populations that Plaintiffs were prepared to assist.

109.    Defendants made these false statements intentionally, knowingly, and with the specific purpose of harming Plaintiffs, obstructing their nonprofit mission, interfering with their public participation, and advancing coordinated retaliation.

110.    Defendants' conduct constitutes fraud and fraudulent misrepresentation under Pennsylvania law.

111.    Plaintiffs request compensatory damages, punitive damages where permitted, injunctive and declaratory relief, attorneys' fees, and any further relief the Court deems just and proper.

**Count 3. NEGLIGENT MISREPRESENTATION**

**(NPLS, USCBA, Stigerwalt-Egan, Sullivan, PBA, Trevaskis, DMVA, Bloomsburg Fair Association, and Leadbeter))**

112.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

113.    In the alternative to intentional fraud, and in addition thereto, multiple private defendants negligently supplied false, inaccurate, incomplete, or misleading information to Plaintiffs, other organizational partners, and the public, in circumstances where these defendants had a duty to

exercise reasonable care in communicating factual information relied upon by Plaintiffs and vulnerable populations.

114.    NPLS and Clark volunteer acting with institutional influence negligently misrepresented that Plaintiffs would be informed, included, and able to participate in Wills for Heroes programming, despite having no reasonable basis to make such assurances and failing to disclose that exclusionary decisions had already been made or were imminent.

115.    These misrepresentations caused Plaintiffs to rely on inaccurate planning expectations, misallocate resources, and fail to prepare alternative structures, resulting in wasted time, lost opportunities, and harm to disabled veterans who received inconsistent or inaccurate eligibility information.

116.    USCBA leadership, including Stigerwalt-Egan and Sullivan, made negligent misrepresentations regarding eligibility for attorney-fee awards, the nature and purpose of Wills for Heroes governance, PLAINTIFFS' qualifications, and SLAAY's intentions, despite having a duty to ensure accuracy in communications distributed to members, the public, and partner organizations.

117.    These statements were made without adequate investigation and with reckless disregard for their truth, causing Plaintiffs to rely on incorrect assumptions regarding bar processes, program access, collaborative opportunities, and professional relationships.

118.    The Pennsylvania Bar Association and its Wills for Heroes director, as well as the Pennsylvania DMVA acting in a programmatic capacity, negligently communicated inaccurate information to Plaintiffs and to the public regarding:

119.    the reasons for Wills for Heroes cancellations,

 b. SLAAY's eligibility and role,

 c. staffing shortages and volunteer availability, and

 d. alleged concerns about protests or conduct by Plaintiffs.

120.    These communications were made without reasonable care, failed to reflect correct program standards, and did not disclose true operational causes, resulting in foreseeable harm to Plaintiffs and to disabled veterans who lost access to critical legal services.

121.    The Bloomsburg Fair Association and Representative Leadbeter negligently provided false or misleading statements to third parties about Plaintiffs' conduct, role, or eligibility to participate in community programs or public events, despite lacking accurate information and failing to verify the truth of such statements.

122.    Plaintiffs reasonably relied on these negligent communications in planning programs, responding to public inquiries, preparing for community events, and structuring nonprofit operations.

123.    As a direct and foreseeable result, Plaintiffs suffered loss of time and resources, damage to professional reputation, exclusion from public and charitable programs, lost opportunities for funding and participation, harm to their ability to serve disabled veterans and low-income individuals, and operational disruption to SLAAY's nonprofit mission.

124.    Defendants' negligent misrepresentations constitute actionable negligence under Pennsylvania law because they created foreseeable and substantial harm to Plaintiffs and the public, and were made in the course of business, public-service programs, or organizational governance where reasonable care was required.

125.    Plaintiffs seek compensatory damages, consequential damages, injunctive and declaratory relief, attorneys' fees where permitted, and all other appropriate remedies.

**Count 4. TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against NPLS, Clark, USCBA, Stigerwalt-Egan, Sullivan, PBA, Trevaskis, PA DMVA,**
**Bloomsburg Fair Association, and Leadbeter)**

126.    Plaintiffs incorporate by reference all prior paragraphs as though fully set forth herein.

127.    Plaintiffs have existing and prospective contractual relationships with public programs, community organizations, clients, funding partners, legal-aid networks, bar-related services, and government agencies, including but not limited to Judicare contracts, Wills for Heroes hosting arrangements, STOP Coalition participation, PLAN membership, public-funding proposals, and community-service collaborations that were reasonably expected to materialize in the normal course of business.

128.    Plaintiffs had a reasonable expectation of obtaining a Judicare contract, as Martineau is the most qualified attorney in the county for such work, had a long history of serving low-income clients, and was otherwise eligible.

129.    NPLS, acting through its internal leadership and an influential NPLS-affiliated volunteer who directed NPLS's attitude toward Plaintiffs and the public, intentionally interfered with that relationship by blocking Judicare eligibility, spreading hostility to other county actors, and advocating against Plaintiffs' participation in publicly funded legal-aid arrangements.

130.    NPLS also communicated that it would block Plaintiffs from joining PLAN, and PLAN thereafter failed to evaluate Plaintiffs fairly, resulting in the loss of prospective contractual, funding, and referral relationships.

131.    Plaintiffs had an existing and prospective relationship with the Pennsylvania Bar Association's Wills for Heroes program and the Pennsylvania DMVA, through which SLAAY had already served as a host organization in Clinton County and was asked to support services for disabled veterans elsewhere.

132.    Clark misled Plaintiffs regarding Wills for Heroes planning while simultaneously acting to exclude SLAAY, causing Plaintiffs to lose the opportunity to serve disabled veterans and preventing the formation of expected contractual or programmatic relationships.

133.    Sullivan interfered by using a Wills for Heroes Committee meeting to demand the suspension of the entire program in Union–Snyder County unless Plaintiffs agreed not to file claims

or dropped protected litigation, thereby intentionally disrupting Plaintiffs' programmatic

relationship with PBA and DMVA.

134.    Stigerwalt-Egan interfered by sending false and disparaging emails to PBA and DMVA to

prevent SLAAY from hosting Wills for Heroes and to undermine its credibility and eligibility.

135.    The Pennsylvania Bar Association, through its Wills for Heroes leadership, interfered with

Plaintiffs' existing and prospective hosting relationships by falsely portraying Plaintiffs' conduct as

improper, excluding Plaintiffs without cause, and coordinating with NPLS to block Plaintiffs'

participation.

136.    The Pennsylvania DMVA further interfered by cancelling the October 11, 2025 Wills for

Heroes event based on Plaintiffs' protected speech and by falsely attributing the cancellation to

alleged protest-related concerns, harming Plaintiffs' ability to host future events and destroying

prospective relationships with disabled veterans and community partners.

137.    Plaintiffs had an existing and prospective collaborative relationship with the STOP Coalition,

where SLAAY agreed to handle PFA cases without charge with the reasonable expectation of

obtaining attorney-fee support as authorized by statute.

138.    Brosius interfered by altering his treatment of SLAAY within the STOP Coalition after

receiving Martineau's protected-speech emails, obstructing collaboration and denying Plaintiffs the

benefits of the anticipated attorney-fee structure and referrals.

139.    Clark, Stigerwalt-Egan, and Sullivan, acting through USCBA, interfered with SLAAY's

STOP Coalition expectations by blocking fee awards, undermining SLAAY's role, and falsely

presenting Plaintiffs as unqualified or disruptive.

140.    Plaintiffs had a prospective relationship with the Bloomsburg Fair Association and

Representative Leadbeter in connection with community outreach, legal-education programming,

and public engagement events.

141.    After Plaintiffs were excluded from Wills for Heroes, the Bloomsburg Fair Association and Leadbeter relied upon and repeated false statements originating from NPLS, PBA, and USCBA actors, and thereafter excluded Plaintiffs from opportunities they previously anticipated.

142.    Each of these defendants knew of Plaintiffs' existing or prospective relations and intentionally caused third parties to deny, terminate, or diminish those relationships.

143.    Defendants' interference was wrongful because it was motivated by retaliation for protected First Amendment speech, involved fraud and deception, arose from personal hostility, and used unlawful means including extortionate demands, retaliatory program cancellations, false statements, and coordinated exclusion.

144.    As a direct and proximate result, Plaintiffs suffered economic losses, lost funding opportunities, harm to professional reputation, lost program participation, lost contractual opportunities, and injury to SLAAY's mission and ability to serve the public—particularly disabled veterans and domestic-violence survivors.

145.    Defendants' actions constitute tortious interference under Pennsylvania law.

146.    Plaintiffs request compensatory damages, consequential damages, punitive damages where permissible, injunctive and declaratory relief, and any further relief the Court deems appropriate.

## Count 5. CIVIL CONSPIRACY (STATE LAW)

**(Against All Private Defendants Acting in Concert: NPLS, Clark, USCBA, Stigerwalt-Egan, Sullivan, PBA, Trevaskis, DMVA in its programmatic capacity, Bloomsburg Fair Association, Leadbeter, and any private actors participating in the coordinated retaliation)**

147.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

148.    Defendants NPLS, a key NPLS-connected volunteer, the Union–Snyder County Bar Association (USCBA), Sarah Stigerwalt-Egan, K. Michael Sullivan, the Pennsylvania Bar Association (PBA), David Trevaskis, the Pennsylvania Department of Military and Veterans Affairs in its programmatic and non-sovereign roles, the Bloomsburg Fair Association, Representative

Leadbeter, and other private actors knowingly combined, agreed, and acted jointly to injure Plaintiffs and interfere with their constitutional rights, nonprofit operations, professional opportunities, and contractual expectations.

149.    These defendants shared a common purpose: to retaliate against Plaintiffs for protected First Amendment activity, to silence Plaintiffs' criticisms of public and quasi-public systems, to preserve monopolistic control over legal-aid and public-service programs, and to prevent SLAAY from obtaining funding, referrals, or participation in community-serving initiatives.

150.    The conspiracy began when NPLS leadership and an influential NPLS-connected volunteer circulated hostility toward Martineau because of her whistleblowing about client harm and malpractice. This hostility was then carried into USCBA, where Clark, Stigerwalt-Egan, and Sullivan worked together to block Plaintiffs from funding, attorney-fee awards, Judicare participation, and bar-based public service programs.

151.    The conspiracy expanded when Sullivan used an official Wills for Heroes Committee meeting to move for suspension of all Wills for Heroes services in Union–Snyder County unless Plaintiffs refrained from filing legal claims. This action was supported and amplified by USCBA leaders and participants who acted in concert to coerce Plaintiffs into silence.

152.    After Plaintiffs informed PBA and DMVA that SLAAY could act as host for Wills for Heroes, USCBA President Stigerwalt-Egan sent false, disparaging, and inflammatory statements to PBA and DMVA to further undermine SLAAY and prevent Plaintiffs from serving disabled veterans.

153.    PBA's Wills for Heroes director, having initially supported Plaintiffs, coordinated with NPLS leadership and with USCBA actors, reversed his position, and communicated false and misleading information to DMVA, resulting in Plaintiffs' exclusion from Wills for Heroes.

154.    PBA and DMVA, acting jointly, then provided written notice cancelling the October 11, 2025 Wills for Heroes event, expressly or implicitly based on Plaintiffs' anticipated peaceful

protest. This cancellation was undertaken to punish Plaintiffs' protected advocacy for disabled veterans and to conceal the earlier retaliatory exclusion.

155.    The Bloomsburg Fair Association and Representative Leadbeter joined the conspiracy after receiving the dishonest communications from NPLS, USCBA, PBA, or DMVA, and thereafter excluded Plaintiffs from public activities based on those statements, furthering the same coordinated scheme of retaliation and reputational harm.

156.    Each member of the conspiracy understood that the others were engaging in retaliatory conduct and knowingly participated in, encouraged, or ratified such conduct, either explicitly or through conduct reflecting a shared understanding and common purpose.

157.    The conspiracy was further evidenced by coordinated timing, shared messaging, reinforcement of each other's false statements, institution-wide hostility after protected speech, suspension or cancellation of programs immediately after Plaintiffs' communications, and a pattern of retaliatory acts spreading across multiple organizations.

158.    Defendants acted with malice toward Plaintiffs, intending to harm them, diminish their nonprofit operations, and deter further protected speech. Malice is shown by the abrupt reversals of support following protected speech, retaliatory votes, coercive conditions, hostile confrontations, and coordinated cancellations.

159.    As a direct and proximate result of this conspiracy, Plaintiffs suffered economic loss, reputational damage, exclusion from community programs, lost opportunities, loss of goodwill, emotional distress, and impairment of SLAAY's charitable mission to serve vulnerable populations including disabled veterans and domestic-violence survivors.

160.    Defendants are jointly and severally liable for all harms caused by any co-conspirator.

161.    Plaintiffs request compensatory and punitive damages, declaratory and injunctive relief, attorneys' fees where permitted, and all appropriate remedies under Pennsylvania law.

**Count 6. DEFAMATION (LIBEL AND SLANDER)**

**(Against USCBA, Stigerwalt-Egan, Sullivan, PBA, Trevaskis, PA DMVA in programmatic capacity, Bloomsburg Fair Association, Leadbeter, Lincoln, and any private actors who republished false statements)**

162.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

163.    Clark, a key NPLS-connected volunteer, acting with institutional influence and coordination, made false statements to USCBA members and others regarding Martineau, and falsely representing SLAAY's capabilities, intentions, and eligibility for participation in public programs including Wills for Heroes.

164.    These statements falsely portrayed Plaintiffs despite knowing that Plaintiffs had extensive qualifications and had performed with distinction for years.

165.    USCBA leadership, including Stigerwalt-Egan and Sullivan, published false statements to PBA, DMVA, coalition partners, and USCBA members asserting that Plaintiffs were ineligible for participation, caused problems with bar programs, engaged in misconduct, or acted improperly in relation to Wills for Heroes.

166.    Stigerwalt-Egan sent false, disparaging, and insulting emails to PBA and DMVA designed to undermine SLAAY's credibility, misrepresent Plaintiffs' conduct, and justify exclusion of Plaintiffs from Wills for Heroes and other programs.

167.    These statements included false allegations about Plaintiffs' professionalism, motives, and behavior, and falsely suggested wrongdoing, unreliability, or disruption when no such conduct had occurred.

168.    Sullivan also made statements implying Plaintiffs caused the suspension or disruption of Wills for Heroes services, when he knew the suspension was his own retaliatory act made to coerce Plaintiffs to abandon litigation.

169.    PBA published false statements to DMVA and others, including misrepresentations that Plaintiffs were no longer eligible or appropriate for Wills for Heroes participation, and mischaracterizing Plaintiffs' communications as problematic or inappropriate.

170.    DMVA and PBA jointly issued written statements canceling the October 11, 2025 Wills for Heroes event based on an alleged protest by SLAAY, falsely suggesting Plaintiffs were responsible for program disruption.

171.    This was factually false and constituted defamation per se by attributing misconduct and improper behavior to Plaintiffs.

172.    The Bloomsburg Fair Association and Representative Leadbeter published false statements regarding eligibility for the annual Veterans Expo.

173.    These falsehoods were published to fair officials, community organizations, and the public, harming Plaintiffs' reputation and resulting in additional exclusion from community events.

174.    USCBA Treasurer and judicial law clerk Kathleen Lincoln made false, threatening, and disparaging statements about Plaintiffs at the July 26, 2025 USCBA meeting, falsely implying that Plaintiffs engaged in misconduct or were improperly pursuing litigation, and communicating these statements to others in the professional community.

175.    The above statements were made with actual malice; that is, with knowledge of their falsity or reckless disregard for the truth, because the defendants intended to retaliate against Plaintiffs for protected speech or acted with hostility arising from Plaintiffs' criticism of institutional misconduct.

176.    Alternatively, the statements were made negligently without reasonable care as to their truth or accuracy in contexts where the defendants had a duty to ensure factual accuracy, such as public programs, bar-association governance, nonprofit communications, and government-affiliated events.

177.    Each of these statements was published to third parties who reasonably understood them as statements of fact, not opinion.

178.    The statements harmed Plaintiffs' professional reputation, nonprofit mission, and community standing, and caused the loss of funding opportunities, professional relationships, program participation, and prospective contracts.

179.    The statements constitute defamation per se because they falsely imputed professional misconduct, unfitness in Plaintiffs' trade, and improper behavior in the context of public service and legal practice.

180.    As a direct result of these false statements, Plaintiffs suffered damages including reputational harm, loss of goodwill, community exclusion, impaired funding opportunities, emotional distress, loss of business and programmatic opportunities, and other measurable injuries.

181.    Plaintiffs seek compensatory and punitive damages, declaratory relief, injunctive relief preventing further publication of defamatory statements, attorneys' fees where permitted, and all other appropriate relief

## Count 7. EQUAL PROTECTION / SELECTIVE ENFORCEMENT 42 U.S.C. § 1983 (Against Brosius, Piecuch, Hackenberg, Conway, DMVA officials, Saleski, USCBA)

182.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

183.    Multiple state actors, including District Attorney Brosius, Judges Piecuch, Hackenberg, and Conway, officials within the Pennsylvania Department of Military and Veterans Affairs acting in their programmatic capacities, and Northumberland County Prothonotary Jamie Saleski, intentionally treated Plaintiffs differently from all other similarly situated individuals and organizations, and that this differential treatment lacked any legitimate governmental basis, had no rational justification, and was motivated by animus and retaliation for Plaintiffs' protected First Amendment activity.

184.    The USCBA explicitly adopts the Constitution via adopting the RPC, so agrees to be bound by the Constitution, as do all attorneys, yet the USCBA provides more funding, support, and goodwill to projects managed by all other members except Martineau.

185.    District Attorney Brosius, and Judges Piecuch, Hackenberg, and Conway, also treated her differently before and after her protected speech, through increased investigation, refusal to exercise discretion for continuances, ignoring her at events, falsely accusing her of ethical violations, yelling, and insulting her.

186.    Every other attorney in Union, Snyder, and Northumberland Counties who resigned from NPLS in good standing has been permitted to maintain professional relationships, participate in Judicare, take referrals, volunteer for legal-aid programs, and remain in good standing within bar and community programs, while Plaintiffs alone were denied Judicare eligibility, denied volunteer access, excluded from public-service programs, and obstructed from opportunities uniformly available to others with similar qualifications, and this singular treatment is not the product of lawful discretion but of discriminatory enforcement.

187.    Brosius altered his treatment of SLAAY within the STOP Coalition only after receiving Martineau's protected speech in April and May 2025, which no other STOP participant experienced; Judges Piecuch and Hackenberg altered their treatment of Plaintiffs after receiving protected communications, including issuing adverse rulings, blocking statutory fee awards, and participating in de facto blacklisting within USCBA, whereas no other attorney who communicated concerns received comparable punishment; Judge Conway responded to Martineau's report of judicial misconduct with hostility, fabricated allegations of ethical wrongdoing, and pressure to abandon meritorious claims, although similarly situated parties were never treated in this manner; and DMVA officials treated Plaintiffs differently from PBA-affiliated groups despite SLAAY's successful Wills for Heroes hosting in Clinton County, because DMVA cancelled the October 11, 2025 event expressly due to Plaintiffs' intent to engage in peaceful protest, which has never been invoked to exclude any other organization from public service.

188.    Saleski selectively enforced recording and filing-related policies only against Plaintiffs while allowing all other attorneys to record routine interactions or handle filings without sanction, and her

selective treatment was motivated by hostility toward Plaintiffs' protected activity and was reinforced by USCBA

189.    Treasurer and judicial law clerk Kathleen Lincoln, who made threatening and disparaging comments regarding Plaintiffs' litigation at the July 2025 USCBA meeting.

190.    There is no legitimate governmental interest that justifies suspending public-service programs to coerce Plaintiffs, cancelling Wills for Heroes because Plaintiffs intended to engage in peaceful protest, denying Judicare eligibility to the most qualified applicant in the county, selectively enforcing recording policies against one attorney while exempting others, retaliating for reports of judicial or legal-aid misconduct, or subjecting Plaintiffs to harsher treatment than every other similarly situated attorney and organization, and Defendants' actions were arbitrary, irrational, and contrary to the Equal Protection Clause.

191.    Plaintiffs assert a class-of-one equal protection claim because they were intentionally singled out for adverse treatment without a rational basis, because all similarly situated persons were treated more favorably, and because Defendants acted out of personal hostility and retaliation. Plaintiffs also assert a selective-enforcement claim based on viewpoint discrimination, because Plaintiffs' protected speech criticizing governmental and quasi-governmental misconduct triggered the adverse treatment, and because Defendants enforced policies and exercised discretion solely to suppress Plaintiffs' speech, which is presumptively unconstitutional.

192.    As a direct and proximate result of Defendants' discriminatory enforcement and unequal treatment, Plaintiffs suffered exclusion from public programs, economic loss, reputational harm, disruption of their nonprofit mission, emotional distress, and other compensable injuries.

193.    Defendants acted under color of state law and are therefore liable under 42 U.S.C. § 1983.

194.    Plaintiffs request compensatory and punitive damages where permitted, injunctive and declaratory relief, attorneys' fees under 42 U.S.C. § 1988, and all other appropriate remedies.

**Count 8. ABUSE OF PROCESS (Against Sullivan, Conway, Piecuch, Saleski, and any defendant who used legal or quasi-legal process for an ulterior purpose)**

195.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that several defendants, including but not limited to K. Michael Sullivan acting through the Wills for Heroes Committee, Judge Conway acting through judicial chambers, Judges Piecuch and Conway acting through judicial and administrative authority, and Prothonotary Saleski acting through filing and recording processes, misused legal or quasi-legal process for purposes for which that process was not designed and in ways that caused direct harm to Plaintiffs.

196.    Sullivan abused process when he invoked the authority of an official Wills for Heroes Committee meeting to move for the suspension of an entire public-service program unless Plaintiffs agreed to withdraw litigation or forfeit their right to sue him personally, because the committee process exists to coordinate program logistics and not to coerce silence or extract concessions unrelated to program administration, and Sullivan's use of the process for an extortionate and retaliatory purpose constitutes a classic abuse of process.

197.    Judge Conway abused judicial process when, instead of adjudicating matters before him or following lawful procedures for addressing reports of judicial misconduct, he used the authority and coercive power of his position to pressure Plaintiffs to abandon legal claims, fabricated ethical allegations to chill Plaintiffs' willingness to report misconduct, and attempted to deter Plaintiffs from exercising rights to petition for redress, all of which represent misuse of judicial process for an ulterior retaliatory purpose.

198.    Judge Piecuch abused process when they used judicial and administrative authority not to adjudicate cases neutrally but to retaliate against Plaintiffs for protected speech, including issuing rulings and administrative decisions for the purpose of punishing Plaintiffs and influencing unrelated matters in which Plaintiffs or their clients were involved, which constitutes the use of judicial process to achieve an improper objective outside the legitimate scope of adjudication.

199.    Prothonotary Saleski abused process when she selectively enforced recording and filing

procedures against Plaintiffs for retaliatory purposes, because the filing and recording process exists

to facilitate public access to courts, not to punish particular individuals, and her selective

enforcement deprived Plaintiffs of equal and impartial access to mandatory court processes and

therefore represents an improper use of ministerial authority for a collateral purpose.

200.    In each instance, Defendants used a legal, judicial, administrative, or quasi-public process

not to accomplish the legitimate ends for which that process was designed but instead to coerce,

punish, retaliate, intimidate, silence, or disadvantage Plaintiffs in matters unrelated to the proper

execution of that process, and each instance satisfies the elements of abuse of process under

Pennsylvania law because Defendants used process for an ulterior purpose and caused actual harm.

201.    As a direct and proximate result of Defendants' abuse of process, Plaintiffs suffered

economic harm, reputational injury, emotional distress, exclusion from public programs and

opportunities, impairment of their nonprofit mission, and other legally cognizable damages.

Plaintiffs request compensatory and punitive damages where permitted, injunctive and declaratory

relief, attorneys' fees where authorized, and all additional remedies the Court deems just and proper.

**Count 9. BREACH OF CONTRACT (Against USCBA and PBA)**

202.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

Plaintiffs allege that the Union–Snyder County Bar Association and the Pennsylvania Bar

Association entered into binding contractual relationships with Plaintiffs by soliciting dues,

adopting membership materials that promised equal treatment and access to programs, representing

that members in good standing would enjoy the full benefits of participation, and incorporating the

Pennsylvania Rules of Professional Conduct into their organizational documents as governing

standards. Plaintiffs were members in good standing who relied on these contractual commitments

when they volunteered for civic programs, participated in committees, and invested substantial time

and resources in bar-sponsored initiatives such as Wills for Heroes. After Plaintiffs engaged in

protected advocacy and whistleblowing concerning malpractice, misuse of public funds, and the exclusion of disabled veterans from community events, USCBA and PBA breached these contractual obligations by excluding Plaintiffs from programs, denying them participation rights afforded to all other members, disseminating false statements to justify exclusion, coordinating with private and governmental entities to block Plaintiffs' participation, and repudiating the promises of fairness and impartiality on which Plaintiffs relied. These breaches caused reputational injury, lost opportunities, organizational harm, emotional distress, and economic loss. Plaintiffs seek declaratory relief confirming the existence and breach of contractual obligations, injunctive relief restoring full membership participation, compensatory damages, and all additional relief the Court deems just and proper.

## Count 10. BREACH OF FIDUCIARY DUTY (Against USCBA, PBA, and NPLS)

203.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that the Union–Snyder County Bar Association, the Pennsylvania Bar Association, and North Penn Legal Services owed fiduciary duties of loyalty, honesty, fairness, impartiality, and good faith to their members, participants, beneficiaries, and collaborating public-service partners. These duties arise from the organizations' self-adopted ethical rules, their representation to the public that they act in the interest of justice, their control over publicly promoted programs, their gatekeeping authority over access to legal-aid and bar-sponsored opportunities, and their acceptance of membership dues or public funds entrusted to them to advance transparent, non-retaliatory public service. Each defendant breached these fiduciary duties by retaliating against Plaintiffs for protected speech, by disseminating false statements to shield institutional allies and discredit Plaintiffs, by using program authority to punish whistleblowers, by refusing to permit Plaintiffs to participate in public-service programs despite their good standing, and by placing personal, political, and institutional interests above their duties to the public and the profession. These actions were disloyal, undertaken in bad faith, and inconsistent with the ethical commitments each defendant

claims to uphold. Plaintiffs suffered reputational harm, professional exclusion, organizational disruption, emotional distress, and economic injury as a result. Plaintiffs seek declaratory and injunctive relief compelling these defendants to comply with fiduciary obligations, compensatory and punitive damages as permitted by law, and all other relief the Court deems just and proper.

**Count 11. PROMISSORY ESTOPPEL (Against USCBA, PBA, DMVA, Sullivan, and NPLS)**

204.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that the Union–Snyder County Bar Association, Sullivan, the Pennsylvania Bar Association, the Pennsylvania Department of Military and Veterans Affairs acting in its programmatic capacity, and North Penn Legal Services made clear and definite promises to Plaintiffs upon which Plaintiffs reasonably relied, including commitments that Plaintiffs would be permitted to participate fully in bar-sponsored programs, that Plaintiffs would be kept informed and included in Wills for Heroes planning and communication, that Plaintiffs would receive fair consideration for Judicare and similar publicly funded service opportunities, and that Plaintiffs and their nonprofit organization would be treated on equal footing with all other attorneys and organizations participating in public-interest programs. These representations were communicated in writing, through official bar and agency communications, and through organizational practices and governance structures that signaled that individuals in good standing would not be arbitrarily excluded from participation or deprived of benefits afforded to others. Plaintiffs relied upon these promises by investing substantial time, resources, and organizational capacity into Wills for Heroes, Judicare, STOP Coalition work, and other bar and agency programs, by preparing to serve disabled veterans and domestic-violence survivors through public-interest initiatives, and by structuring SLAAY's operations around the commitments made by these defendants.

205.    Defendants knew or reasonably should have expected that Plaintiffs would rely on these promises, and Plaintiffs' reliance was reasonable in light of Defendants' official roles, public-serving missions, stated policies of fairness and equal treatment, adoption of the Rules of Professional

Conduct, and repeated written assurances of participation and inclusion. Defendants subsequently reneged on these promises and acted in direct contradiction to them by excluding Plaintiffs from Wills for Heroes, cancelling events based on Plaintiffs' protected speech, refusing to allow Plaintiffs to participate in Judicare or STOP Coalition opportunities, disseminating false statements to justify exclusion, and revoking access to programs despite Plaintiffs' substantial reliance and their good standing within the profession.

206.    Defendants' withdrawal of promised participation and benefits caused Plaintiffs to suffer wasted time and resources, lost professional and organizational opportunities, reputational harm, emotional distress, and direct financial injury, and their actions make enforcement of these promises necessary to avoid injustice. Plaintiffs therefore seek declaratory and injunctive relief, reliance damages, consequential damages, and any additional relief the Court deems just and proper under the doctrine of promissory estoppel.

**Count 13. RICO ENTERPRISE (NPLS, USCBA, PBA, PLAN, LSC, DMVA, BFA, ABA, NCBE, ODC, DB, JCB, CJD, AOPC, PaSC, COPA, PBLE, PaCPRC, PaCrPRC, CLEB, PGA, OAG, USLSC, USC, USJC, MBC, SE, KMS, DT, MP, LH, MC, HB, JS, RL)**

207.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

208.    Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c), against all defendants who participated in the affairs of an enterprise through a pattern of racketeering activity.

209.    Defendants including NPLS, a key NPLS-connected volunteer, the Union–Snyder County Bar Association, Sarah Stigerwalt-Egan, K. Michael Sullivan, the Pennsylvania Bar Association, David Trevaskis, the Pennsylvania Department of Military and Veterans Affairs in its programmatic capacity, the Pennsylvania Legal Aid Network, the Legal Services Corporation, the Bloomsburg Fair Association, Representative Leadbeter, and other private and public actors working jointly with them constitute an enterprise within the meaning of 18 U.S.C. § 1961(4) because they formed an

association-in-fact composed of interconnected nonprofit corporations, bar associations, public officials, legal-aid administrators, and government program administrators who shared overlapping leadership, financial interests, institutional power, and coordinated decision-making.

210.    The enterprise existed for the purpose of maintaining control over legal services, public-service programs, bar-related opportunities, and community legal initiatives in multiple counties, and of retaliating against Plaintiffs in order to suppress their protected First Amendment speech that threatened that control.

211.    The enterprise operated through mutually reinforcing relationships among these actors, who used their respective roles in public and private institutions to suppress dissent, protect one another from oversight, coordinate false narratives, and exclude Plaintiffs from participation in legal-aid, bar, veteran-service, and community programs, and the enterprise functioned hierarchically in that NPLS generated hostility and false information about Plaintiffs, USCBA implemented adverse voting decisions and interference with public-service programs, PBA and Trevaskis facilitated exclusion from Wills for Heroes and coordinated communications, DMVA operationalized program cancellations and published pretextual justifications, PLAN and LSC provided structural insulation and failed oversight enabling the misconduct to persist, and the Bloomsburg Fair Association and Representative Leadbeter amplified retaliatory messaging and exclusion in the public sphere.

212.    In furtherance of the enterprise, defendants engaged in numerous acts constituting racketeering activity under 18 U.S.C. § 1961(1), including wire fraud in the form of false electronic communications that misrepresented Plaintiffs' qualifications, conduct, eligibility, and intentions, and which were sent to DMVA, PBA, STOP Coalition members, community organizations, and others for the purpose of excluding Plaintiffs; mail fraud in the form of written program-cancellation notices and written bar-association communications containing false or misleading statements made to justify retaliatory conduct; extortion under color of official right when Sullivan used a Wills for Heroes Committee meeting to condition reinstatement of public services on Plaintiffs' agreement to

forfeit their right to sue or withdraw claims; retaliation against a witness by targeting Plaintiffs after they reported judicial misconduct and legal-aid malpractice; obstruction of justice through efforts to pressure Plaintiffs not to pursue judicial-misconduct reporting and through coordinated interference with Plaintiffs' access to bar processes after protected complaints; and deprivation of honest services through misuse of bar authority, public-program authority, and legal-aid funding decisions to serve private retaliatory motives.

213.    These racketeering acts occurred continuously from the 1870s through 2018 through 2025 and were related to one another because they shared the common purpose of suppressing Plaintiffs' protected speech, excluding Plaintiffs from public programs, and preserving institutional control within the enterprise, and they amount to or pose a threat of continued criminal activity due to their repetitive nature, longstanding coordination, and the involvement of numerous actors across different organizations.

214.    Each defendant associated with the enterprise conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through this pattern of racketeering activity.

215.    As a direct and proximate result of the racketeering activity, Plaintiffs suffered lost funding opportunities, exclusion from public programs, reputational harm, loss of prospective contracts, operational disruption to SLAAY, emotional distress, lost income, diminished community standing, and harm to disabled veterans and domestic-violence survivors whom Plaintiffs were prepared to serve.

216.    Plaintiffs seek treble damages, attorneys' fees, injunctive relief, and all remedies authorized by 18 U.S.C. § 1964(c).

**Count 14. RICO CONSPIRACY (NPLS, USCBA, PBA, PLAN, LSC, DMVA, BFA, ABA, NCBE, ODC, DB, JCB, CJD, AOPC, PaSC, COPA, PBLE, PaCPRC, PaCrPRC, CLEB, PGA, OAG, USLSC, USC, USJC, MBC, SE, KMS, DT, MP, LH, MC, HB, JS, RL)**

217.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

218.    Plaintiffs assert that all RICO defendants violated 18 U.S.C. § 1962(d) by conspiring to
participate in the enterprise described above and by agreeing that at least one of them would commit
acts constituting racketeering activity.

219.    Defendants knew that the objective of the enterprise was to retaliate against Plaintiffs,
suppress Plaintiffs' protected speech, preserve institutional power, and exclude Plaintiffs from
public-service, bar-related, and community programs, and they knowingly agreed to facilitate each
other's racketeering acts.

220.    Defendants committed overt acts in furtherance of the conspiracy, including voting to block
fees, transmitting false statements about Plaintiffs, suspending or cancelling public programs,
denying participation opportunities, pressuring Plaintiffs to abandon litigation, and coordinating
exclusionary and retaliatory actions among enterprise members.

221.    As a direct and proximate result, Plaintiffs suffered the injuries previously described, and
Plaintiffs seek treble damages, attorneys' fees, and all other relief authorized by law.

## Count 15. DECLARATORY JUDGMENT — UNCONSTITUTIONAL STRUCTURAL DELEGATIONS (28 U.S.C. §§ 2201–2202) (All Defendants)

222.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein.

223.     Plaintiffs seek a declaratory judgment that the fifteen unconstitutional delegations of state
authority through which Defendants regulate legal education, bar admission, character and fitness,
peer reporting, local court rules, civil rules, criminal rules, professional conduct rules, courthouse
regulations, disciplinary procedures, fee-dispute structures, public legal-aid funding and oversight,
immunity doctrines, judicial recusal rules, and attorney-withdrawal practices collectively violate the
United States Constitution because these delegations transfer core sovereign governmental powers
to private entities that are not subject to constitutional accountability, democratic oversight,
procedural safeguards, or administrative limitations, and because these delegations allow private
corporations, nonprofit associations, and hybrid public–private bodies to exercise binding authority

over the rights, opportunities, and professional existence of Plaintiffs without due process, without

equal protection, and without any lawful statutory framework authorizing such delegations.

224.    Plaintiffs allege that the American Bar Association, the National Conference of Bar

Examiners, the Pennsylvania Bar Association, the Union–Snyder County Bar Association, the

Pennsylvania Legal Aid Network, the Legal Services Corporation, North Penn Legal Services, the

Supreme Court of Pennsylvania, and the rulemaking committees and administrative offices acting

under its authority collectively participate in this unconstitutional structure by creating, enforcing, or

operationalizing standards that determine who may enter the legal profession, who may receive

government-funded legal services, who may participate in public-interest programs, what rules

govern attorneys' speech and conduct, and what procedures apply to the public when seeking access

to courts. These organizational defendants operate outside any constitutionally authorized

administrative scheme and exercise coercive governmental authority that binds Plaintiffs and

similarly situated individuals.

225.    Plaintiffs seek a declaration that these fifteen structural delegations violate the Due Process

Clause, the Equal Protection Clause, and the nondelegation doctrine because they empower private

organizations to create and enforce binding rules that affect Plaintiffs' rights and obligations without

providing any meaningful opportunity for notice, hearing, challenge, review, political recourse, or

democratic accountability. Plaintiffs further seek a declaration that these delegations are void

because they allow private actors to exercise authority traditionally and exclusively vested in the

state, including authority over the courts, the bar, and the administration of public services, and that

this structure has caused concrete injury to Plaintiffs by allowing retaliatory, discriminatory, and

arbitrary decisions to occur under the guise of state power. Plaintiffs request such declaratory relief

as the Court deems just and proper under 28 U.S.C. §§ 2201–2202.

**Count 16. 42 U.S.C. § 1983 — STRUCTURAL CONSTITUTIONAL VIOLATIONS ARISING**
**FROM UNCONSTITUTIONAL DELEGATIONS**

**(Against ABA, NCBE, PBA, USCBA, PLAN, LSC, NPLS, DMVA, BFA, COPA, PaSC, ODC, DB, JCB, CJD, AOPC, PaCPRC, PaCrPRC, PBLE, CLEB, PGA, OAG, USLSC, USC, USJC)**

226.    Plaintiffs incorporate by reference all preceding paragraphs as though fully set forth herein. Plaintiffs allege that the institutional defendants named herein acted under color of state law by exercising governmental powers stemming from the fifteen unconstitutional delegations of state authority described above, because each institution participated in creating, enforcing, or administering binding rules, standards, programs, or determinations that materially affect Plaintiffs' rights and obligations, and because these institutions exercise governmental authority despite being private corporations, nonprofit associations, or hybrid entities without constitutional accountability or statutory authorization.

227.    The American Bar Association acted under color of state law by establishing accreditation standards that Pennsylvania incorporates as mandatory prerequisites for bar eligibility and by influencing the rules of professional conduct adopted by the Supreme Court of Pennsylvania. The National Conference of Bar Examiners acted under color of state law by controlling the structure, scoring, and content of bar examination components adopted as binding licensure requirements by Pennsylvania. The Pennsylvania Bar Association and the Union–Snyder County Bar Association acted under color of state law by exercising delegated authority over public-service programs, attorney-participation decisions, and bar-governance matters that materially affected Plaintiffs' legal rights and professional opportunities. PLAN and LSC acted under color of state law because they control the allocation of state and federal legal-aid funding, supervise service providers such as NPLS, determine eligibility for publicly supported legal services, and impose mandatory rules on the operation of state-funded legal-aid organizations. NPLS acted under color of state law because it receives and disburses public funds, controls client access to government-funded legal services, and makes determinations that affect legal rights for low-income residents pursuant to governmental authority delegated by PLAN, LSC, and the Supreme Court of Pennsylvania. The Supreme Court of

Pennsylvania and its rulemaking committees acted under color of state law by adopting and enforcing rules that incorporate standards created by private entities, thereby transforming private standards into binding law without constitutional compliance.

228.    These institutional defendants violated Plaintiffs' constitutional rights by implementing, enforcing, or benefiting from the fifteen unconstitutional structural delegations in ways that denied Plaintiffs due process, denied them equal protection of the laws, permitted private retaliation masquerading as state action, and deprived Plaintiffs of access to fair procedures for determining eligibility to participate in publicly funded legal services, public-interest law programs, bar-authorized programs, and ordinary professional opportunities. Plaintiffs were harmed by this structure because it enabled private defendants to retaliate against them, exclude them from public programs, distort eligibility determinations, deny them statutory opportunities such as attorney fees and Judicare funding, and otherwise impose adverse consequences under color of state law without any lawful procedural safeguards.

229.    The retaliation described in this Complaint was possible only because the modern system governing law, courts, and public legal services rests on fifteen unconstitutional delegations of state power that evolved in the late nineteenth century, during the same era when women, minorities, and freedmen first obtained political rights and the bar moved to insulate itself from democratic control. These delegations place core sovereign functions into the hands of private and hybrid bodies: legal education is governed by the ABA; the bar examination by the NCBE; character and fitness by opaque bar-controlled bodies; peer-reporting and discipline by lawyers policing rivals; local rules by individual judges acting without statute; civil and criminal procedure by rulemaking committees dominated by lawyers; professional-conduct rules by the ABA and adopted wholesale by PaSC; courthouse-access rules by administrative orders influenced by private models; attorney discipline by DB, ODC, JCB, and CJD applying privately drafted ethics rules; fee-dispute systems by bar bodies regulating their own financial interests; funding for legal aid by PLAN and LSC with no

independent conflicts-guardrail; the American Rule by judge-made doctrine designed to deter suits; judicial immunity by judge-created shields with no basis in statutory text; recusal by judges enforcing standards written by the ABA; and withdrawal rules by the same private actors that drafted the Rules of Professional Conduct. Each delegation suffers from the same defects: power is exercised without statute, without intelligible standards, without accountability, and without public oversight; private groups create binding law; judges enforce rules written by private associations; bar organizations regulate competitors; and legal-aid corporations use public money to gatekeep justice. These fifteen delegations interlock, reinforce each other, and form a closed regulatory loop in which private actors wield state power vertically through courts and horizontally across agencies, making it possible for retaliation that originated within NPLS to spread through PLAN, LSC, USCBA, PBA, DMVA, disciplinary bodies, judicial offices, the Prothonotary, BFA, and the Commonwealth itself. Plaintiffs' injuries stem not from isolated acts but from a unified system that shields insiders, excludes lay oversight, and enables private entities to control sovereign functions without constitutional restraint.

230.    This complaint seeks not only to enjoin these specific rules but also to restore a constitutionally accountable system in which the public, not the profession, determines standards of competence, ethics, and discipline.

231.    Effectively immediately, all laws written by lawyers, including laws requiring law school, the bar examination, or character and fitness, peer report and a lawyer disciplinary board as oversight, attorney-drafted Rules of Procedure, Rules of Conduct, or local rules, Rules on Courthouse procedures, fee disputes, attorney withdrawal, funding legal aid through PLAN and LSC, the American Rule, the Recusal Rules, and the Immunity Rules, should be declared unenforceable.

232.    Plaintiff proposes a comprehensive least restrictive alternative that returns regulatory power to the people. Under this model, attorneys and judges would be observed and evaluated by lay

monitors, nonlawyers drawn randomly from the community, who attend hearings or review recorded proceedings and submit evaluations on clarity, diligence, fairness, and communication. Lay adjudicators, not attorneys, would decide disciplinary matters and fee disputes through panels with a lay majority to ensure impartiality and community accountability. Lay rulewriting panels would periodically review and rewrite the Rules of Professional Conduct, the local court rules, and the rules of civil and criminal procedure so that they serve the public interest rather than lawyers' private interests.

233.     This least restrictive alternative further calls for the rescission of unlawful common law doctrines that entrench self-governance by the profession: the American Rule, which limits fee recovery and deters public litigation; judicial recusal and immunity doctrines, which are presently determined by judges themselves; and attorney withdrawal rules, which allow lawyers to abandon clients over disagreement or economic inconvenience. Each of these determinations should instead be made by lay panels, who would decide when a judge must recuse, when judicial immunity should apply, and whether an attorney's withdrawal is justified, ensuring that these questions of public trust are resolved by neutral citizens rather than by insiders.

234.     This lay governed framework directly measures competence and integrity, eliminates the prior restraint inherent in academic credentialing, ensures equal opportunity to practice advocacy, and realigns the justice system with constitutional guarantees of republican government, due process, and the right of petition.

235.     Plaintiffs therefore seek declaratory and injunctive relief, compensatory damages where authorized, punitive damages against non-governmental institutional defendants where available, and attorneys' fees and costs under 42 U.S.C. § 1988. Plaintiffs request all further relief the Court deems just and proper.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor, declare the structural delegations and Defendants' acts unlawful, enjoin any further enforcement or retaliation, restore Plaintiffs' full eligibility for all programs and opportunities wrongfully denied, award compensatory, punitive, and treble damages as permitted by law, grant attorneys' fees and costs, and provide any additional legal or equitable relief necessary to remedy the injuries described herein.

Dated: November 13, 2025        s/Paige Martineau, Esq.
Paige Martineau, Esq.
Executive Director
SLAAY (Susquehanna Legal Aid for Adults and Youth)
647 East Third Street
Williamsport, PA 17701
570-392-3025
paigemartineau@slaay.org